J-S19017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: A.M.D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.M., MOTHER | : | No. 3462 EDA 2019 |

Appeal from the Decree Entered November 5, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000788-2019

| IN THE INTEREST OF: A.A.D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.M., MOTHER | : | No. 3463 EDA 2019 |

Appeal from the Decree Entered November 5, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000789-2019

BEFORE:  BOWES, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED MAY 01, 2020**

T.M. (Mother) appeals from the decrees entered in the Philadelphia Court of Common Pleas, Juvenile Division, granting the petition of the Philadelphia Department of Human Services (DHS) to terminate involuntarily Mother's parental rights to her minor daughters, A.M.D.M. and A.A.D.M. (the Children), pursuant to subsections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]    Additionally, Mother's counsel, Emily Cherniak, Esquire

_____

[1] 23 Pa.C.S. §§ 2101-2938.  By separate decree the same day, the trial court involuntarily terminated the parental rights of the Children's unknown
*(Footnote Continued Next Page)*

(Counsel), has filed with this Court a motion for leave to withdraw as counsel and a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), and *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992) (extending *Anders* briefing criteria to appeals by indigent parents represented by court-appointed counsel in involuntary termination matters). We grant Counsel leave to withdraw and affirm.

A.M.D.M. and A.A.D.M., twin girls, were born in November of 2018 to Mother and an unknown father. N.T. at 29, 67. DHS obtained an order of protective custody for both children on November 8, 2018, as they were born with marijuana in their systems, and because Mother had open dependency cases with three older children. *Id.* at 7-8. Ta'Neesha Coker, Community Umbrella Agency (CUA) case manager, was involved with Mother and her older children since January 2016. *Id.* at 8. The Children were placed in a foster home with their older sibling, S.M., and have been in that home all of their lives. *Id.* at 23.

DHS filed dependency petitions as to the Children and, following a hearing, the trial court adjudicated the Children dependent on December 21, 2018. DHS Ex. 6. On that same day, an aggravated circumstances order

_(Footnote Continued)_ ————————————

father (Father). According to the trial court, Father, still unknown, has not appealed from that decree. Trial Ct. Op., 1/9/20, at 1 n.2; N.T., 11/5/19, at 29, 67.

was entered as to Mother, due to the fact that Mother's parental rights to S.M. had been terminated involuntarily on January 23, 2018. DHS Ex. 7; *see also* N.T. at 27.

Mother was offered twice weekly supervised visitation. Orders of Adjudication, 12/21/18, at 2. Mother was referred to the Clinical Evaluation Unit (CEU) for a drug screen, drug assessment, and three random drug screens. *See* Orders of Adjudication, 12/21/18, at 2; N.T. at 15-18. Mother was also referred to the Behavioral Health System (BHS) for a consultation and/or evaluation. N.T. at 16-17. According to Ms. Coker, Mother never completed the behavioral health evaluation; although three separate appointments were made, Mother did not attend. *Id.* at 17. Mother never attended her January 17, 2019 CEU assessment. *Id.* at 29.

A permanency review hearing was held on March 25, 2019. At that time, Mother's visitation remained twice weekly. Permanency Review Order, 3/26/19, at 1. She was again referred to the CEU for screening, assessment, and random drug screens, and to BHS for consultation and/or evaluation. *Id.* at 1-2; *see also* N.T. at 22. Mother had attended Dunbar for mental health and counseling, but Dunbar did not release her treatment plan. Permanency Review Order, 3/26/19, at 2. Mother claimed that she used medical marijuana due to multiple sclerosis (MS), but she did not provide documentation for medical marijuana usage, despite repeated directives to do so. N.T. at 15-16. A Single Case Plan (SCP) was created for

Mother on March 26, 2019. *Id.* at 9-10. Ms. Coker testified that Mother's goals were "[v]isitation, mental health, drug and alcohol, stabilization of the home, [and] employment." *Id.* at 9. CUA caseworkers reviewed the plan with Mother, and Mother signed the plan. *Id.* at 11.

A permanency review hearing was held on May 31, 2019. Mother had shown minimal compliance with the permanency plan. Permanency Review Order, 5/31/19, at 1. Mother's visitation was reduced to weekly supervised visits, and she was ordered to have a forthwith drug screen and assessment at Dunbar and provide that assessment to CUA. *Id.* at 1-2. Mother was discharged from Dunbar in May 2019 due to her poor attendance and was not allowed to re-engage with Dunbar due to her prior non-compliance. N.T. at 18-19.

On July 22, 2019, an SCP meeting was held for the Children. Mother did not attend this meeting, and the plan was created on July 26, 2019.[2] N.T. at 13. Mother's parental objectives were to maintain a positive relationship with the Children through regular visitation; maintain her utility bills and suitable housing for the Children; stabilize her mental health, drug and alcohol issues; comply with recommendations from the CEU; and

---

[2] Mother signed the single case plan objective on September 4, 2019.

comply with the termination of parental rights of S.M.[3] *Id.*; *see also* Pet. Involuntary Termination, Ex. A.

Mother did not attend the September 6, 2019 status review hearing. *See* Pet. Involuntary Termination, Ex. A. Mother was again referred to the CEU for random drug and alcohol screens. *Id.* Mother had not engaged in any mental health services since her discharge from Dunbar in May 2019, nor had she engaged in drug and alcohol treatment since December 2018. N.T. at 18-19. Mother resided in a home, but the home did not have gas service since July 2019. *Id.* at 19. Ms. Coker was not able to assess Mother's home for safety. *Id.* at 19-20. Mother reported that she had no income at all and, although she spoke with caseworkers about applying for supplemental security income (SSI), Mother never completed an application for SSI. *Id.* at 20.

In October 2019, Mother's mental state appeared to decline. N.T. at 40, 48. Mother exhibited odd behavior at visitation with the Children, including barking like a dog, yelling in the parking lot, and speaking in different accents to staff. *Id.* Mother's appearance was disheveled. *Id.* at 40. Alexis Stackhouse, the CUA visitation specialist, was concerned for the Children's safety during Mother's visitation at this time. *Id.* at 48.

---

[3] It is unclear, from the record, what "comply with the termination" means.

On October 21, 2019, DHS filed a petition seeking the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court conducted a termination hearing on November 5, 2019. At the hearing, DHS presented the testimony of CUA case manager Coker; CUA visitation specialist Stackhouse; and Julianne Anguera, CUA outcome specialist. Margaret Jefferson, Esquire, represented the Children and argued in favor of termination. Mother, represented by Counsel, testified on her own behalf.

Ms. Coker explained that Mother's compliance with her SCP goals was minimal:

> At this point in time, the only thing that [Mother] is consistently or moderately compliant on is her visitation. She's not engaged in drug and alcohol. She's not engaged in mental health. She . . . doesn't return for her assessments, or sometimes she doesn't go to her forthwith. She doesn't complete randoms. She's currently not employed.

N.T. at 21. With regard to contacting Mother for drug screens, Ms. Coker stated that Mother did not always have a working phone. *Id.* At the March 2019 court hearing, Mother was ordered to report to CEU for a forthwith drug screen, but did not attend because "she said she had some kind of medical emergency or something." *Id.* at 22. Mother also never progressed beyond supervised visits because

> she hasn't been compliant with her single case goals. She hasn't addressed her mental health. She hasn't addressed her drug and alcohol, which were two [ ] of the main things that we would determine whether or not, you know, she's stable enough to have unsupervised visits.

- 6 -

*Id.* at 23.

Ms. Coker testified about her observations of the Children interacting with their foster mother:

> [The Children] definitely look to her as a mother-figure. They are very bonded with her. They — you know, if they fall or cry or they get upset, you know, they look to her to be nurtured or to care for. They're doing very well in the home. They're walking[ and] talking. They're bonded with [their] biological siblings, as well as [foster mother's] children who also are in the home.

*Id.* at 23-24. Ms. Coker testified that it was in the Children's best interests for Mother's parental rights to be terminated because the Children had been in care for a year; Mother was minimally compliant with her SCP goals and objectives and did not have a safe home for the Children; and with the agency "working with [Mother] since 2016, [Mother has never] been compliant [with] any of her children." *Id.* at 25-26. Ms. Coker also stated the foster mother and her husband are the only parents the Children have ever known. *Id.* at 31-32.

Ms. Anguera, CUA outcome specialist, testified that she became involved in this case in March 2019. N.T. at 38. Ms. Anguera attempted to have bi-weekly contact with Mother to review her SCP goals and objectives. *Id.* at 39. Mother never provided documentation of any drug and alcohol or mental health services; information about her home, except that her gas service had been turned off; or documentation of a medical reason for her marijuana use. *Id.* at 41-42. Mother also never provided proof of

employment nor discussed any plans to seek income. *Id.* Finally, Mother never indicated trouble understanding her goals, which remained the same throughout this case. *Id.* at 42.

Ms. Anguera also testified that in October 2019, she noticed "a decline" in Mother's mental state, where Mother regularly talked "in different voices/accents." N.T. at 40. [A]t the end of September or October [2019], it seemed that [it] was increasing. Ms. Anguera stated that during one visitation with the Children, she asked Mother how the visit was going, Mother "mentioned that she was barking like a dog and proceeded to bark like a dog." *Id.* After that visit, Ms. Anguera found Mother's "appearance just seemed a bit more disheveled." *Id.*

Ms. Stackhouse testified that she supervised Mother's visitation with the Children since July 2019. N.T. at 46. From July to October, Mother's visitation was fairly normal and she attended the visits consistently. *Id.* at 36-37, 48. Mother was able to change the Children's diapers, feed them, and engage in age-appropriate activities, such as finger play, singing songs, and getting down to the Children's eye level to play with toys with them. *Id.* at 53-54. However, at the end of September, the quality of the visits decreased as Mother's mental state appeared to decline. *Id.* at 48, 54. Mother often needed to be redirected and at times she would attempt to walk out of the room with the Children, yell in the parking lot, or bark like a dog. *Id.* at 46-47. Mother ceased engaging in age-appropriate play with

the Children and instead began to interact with them "as if they were adults." *Id.* at 55. Ms. Stackhouse observed Mother's inappropriate behavior towards CUA staff members, including Mother's statement that "she wanted to grab one . . . co-worker's package [sic]." *Id.* at 52.

Ms. Stackhouse had concerns for the Children's safety as a result of Mother's behavior. Ms. Stackhouse described one incident where Mother put the Children in a pack-and-play and tilted the pack-and-play toward her while sitting on the floor:

> [The Children] kind of bumped into each other. And they were crying. They were already crying and frustrated. They had been there for a while. The transition with them coming in was kind of rough. The relationship between [Mother] and Foster Mom is kind of rocky. And the kids can sense that. So, all of those things going on and then them being there for the long period of time that they were there, Mom was kind of frustrated. The kids were frustrated. It was a — not a good visit that day.

*Id.* at 48, 50-51. When Ms. Stackhouse discussed the situation with Mother, Mother "laughed and took one of the babies out of the pack[-]and[-]play and left the other one in and asked me if I can pick the other child up that was in the pack[-]and[-]play." *Id.* at 48.

Ms. Stackhouse testified that the Children cry when they arrive at visits and have to leave their foster parents, but they are easily able to separate from Mother and return to the foster parents after the visits end. N.T. at 48-49. Mother does not bring anything to the visits, such as snacks or toys, to engage with the Children. *Id.* at 52. Mother appears overwhelmed dealing with both of the Children by herself, and brings her

mother to help her. *Id.* at 52. Ms. Stackhouse did not believe that the Children would suffer any significant harm if visitation with Mother ended. *Id.* at 49.

Mother testified that previously, she attended Dunbar twice weekly for mental health services for two to three months. N.T. at 57-58. However, after she missed several days of visits, she was not allowed to return. *Id.* Mother claimed she missed these visits due to being hospitalized for a week, and that she attempted to contact Dunbar to resume services, but was refused. *Id.* at 58, 69. Mother stated she would like to find another mental health service provider, but admitted she did not ask Ms. Coker to assist her in doing so. *Id.* at 58. Mother admitted to past marijuana use, but stated that she used marijuana to "calm down [her] nervous system." *Id.* at 59-60. Mother stated that she was diagnosed with MS in 2014, and that she was unable to provide documentation regarding medical marijuana "until I actually get the card." *Id.* at 60, 68-69.

Mother stated that she was not currently working, but was getting some form of assistance, and food stamps. N.T. at 61. Mother was denied Social Security benefits but stated that she was "definitely appealing." *Id.* at 61-62. Mother has lived in her current home all of her life, but admitted there was no working gas service. *Id.* at 62. Mother did not have the $300 necessary to resume the gas service, and had not asked Ms. Coker for help in obtaining financial assistance to do so. *Id.* Mother stated that she "had a

new paper that [she] just received today that they might help" and believed she could have the gas service turned on shortly. *Id.* at 62-63.

Mother denied pulling the pack-and-play to the side. N.T. at 63. Mother stated that she brings little toys and "little doorknobs" for the Children to play with during visitations. *Id.* at 64. Mother claimed that she needed "a little more time," approximately two and a half months, to "get [her] life in order" and to receive her "disability check, if possible." *Id.* at 65. Mother stated she was able to manage the Children's needs because she had help. *Id.* When asked who would be helping her, Mother stated "I have a person whose name is [S.W.]. And he helps me out on a regular basis . . . and their dad will come through and help me[,] too. His name is [D.] I don't remember his last name. But he is available to come definitely."[4] *Id.* at 65-66.

By decrees dated and entered November 5, 2019, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On December 3, 2019, Mother filed a timely, counseled notice of appeal. Mother did not simultaneously file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) (requiring appellant to file statement with notice of appeal

---

[4] The trial court reiterated that Father had never been identified. N.T. at 67. The court stated Mother's identification of D., last name unknown, as the Children's father was a "last-minute attempt to delay permanency for [the] Children." *Id.* at 68.

- 11 -

when case involves children's fast track appeal). On December 16, 2019, this Court ordered Counsel to file a Rule 1925 statement, and Counsel complied on December 18th.

In this Court, Counsel has filed an **Anders** brief and accompanying petition to withdraw. "This Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by" the appellant. **Commonwealth v. Orellana**, 86 A.3d 877, 879 (Pa. Super. 2014).

> Prior to withdrawing as counsel on direct appeal under **Anders**, counsel must file a brief that meets the requirements established by the Pennsylvania Supreme Court in **Santiago**[:]
>
> > (1) provide a summary of the procedural history and facts, with citations to the record;
> >
> > (2) refer to anything in the record that counsel believes arguably supports the appeal;
> >
> > (3) set forth counsel's conclusion that the appeal is frivolous; and
> >
> > (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> Counsel also must provide a copy of the **Anders** brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed pro se on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the **Anders** brief." . . .

**Orellana**, 86 A.3d at 879-80, *quoting* **Santiago**, 978 A.2d at 361.

Only after determining that counsel has satisfied these technical requirements of *Anders* and *Santiago* may this Court examine the record and "render an independent judgment [as to] whether the appeal is in fact 'frivolous.'" *Orellana*, 86 A.3d at 882 n.7 (citation omitted).

We conclude Counsel's *Anders* brief complies with the above requirements. She includes a summary of the relevant factual and procedural history, and sets forth her conclusion that the appeal is frivolous and no meritorious issues could be raised. Additionally, Counsel states she has supplied Mother with a copy of the *Anders* brief and a letter explaining her rights. *See Orellana*, 86 A.3d at 879-80. Thus, we proceed to independently review the record to determine if the issues raised are frivolous, and to ascertain whether there are non-frivolous issues Mother may pursue on appeal.

Counsel's *Anders* brief raises the following issue for our review:

A. Whether [t]he Philadelphia Department of Human Services failed to prove by [clear] and convincing evidence that [M]other's parental rights should have been terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (b) since she had substantially completed her objectives as required?

B. Whether [t]here was a strong emotional and parental bond between [Mother and the Children] which would have a negative effect on the [Children] if the parental bond was permanently severed?

*Anders* Brief at 5. Counsel addresses an argument that DHS did not meet its burden of proof under 23 Pa.C.S. § 2511(a) because Mother substantially completed her objectives as required. *See id.* at 8.

- 13 -

We note the relevant standard of review.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

The termination of parental rights is governed by Section 2511.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In*

*re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *    *    *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> *    *    *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent . . . .

23 Pa.C.S. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).

The trial court stated its findings at the termination hearing:

[The Children] from the hospital came into care and have never actually resided with [Mother. Mother's] objectives were visiting, mental health, housing, drug and alcohol, employment. . . . I find CUA's testimony credible through the case manager as well as the coach — outcome specialist — that CUA had someone meeting with [Mother] almost on a regular basis, almost every other week/every two weeks to discuss . . . her single case plan objectives . . . .

Again, the only thing that [Mother] did was her visits. She engaged in mental health services for a very brief period of time at Dunbar but then did not continue to engage in those services; was actually dropped by her own admission because she didn't attend frequently enough to be able to stay on the rolls for their services. And then, by her own admission, she never did ask CUA for any additional assistance in reengaging in mental health services.

- 16 -

And she was meeting with CUA on a regular basis through the outcome specialist and indicated that she would be able to reengage herself in the services. [Mother], by her own admission, indicated that her housing is not appropriate [and] that she currently doesn't have any financial means of supporting these children.

And [Mother], by her own admission, is still using marijuana. But while she cites a medical reason, by her own admission here today, she has indicated that she doesn't have [an] actual medical marijuana card that she could produce. And quite frankly, even if she could produce a medical marijuana card, for one-year-old[ children] . . . I would be concerned about a parent's ability to adequately supervise while under the influence of marijuana.

So, even if [Mother] had a medical marijuana card, I would still need additional information to show that she could appropriately parent. For the entire time that [the Children's] case has been in front of me, [Mother] hasn't achieved any of her single case plan objectives.

And given the fact that the testimony is [Mother] has a history in this courthouse that even predates these two children coming into care, that started in 2016 and that her single case plan objectives even back in 2016 were the exact **same objectives**: [h]ousing, mental health, [drug and alcohol], employment. Here we are, three years later, and [Mother] has not addressed any of those objectives.

And it appears that she cannot or will not remedy the circumstances that have caused these children to be without the essential parental care, control, and assistance necessary from a parent.

N.T. at 77-79 (emphasis in original).

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). We emphasize the trial court's finding that Mother had not completed any of her objectives, which had

- 17 -

essentially remained unchanged since her older children's case commenced in 2016. N.T. at 79. We further note the trial court's finding that Mother did not ask for necessary assistance from CUA, despite the fact that case workers were meeting with Mother almost weekly. *Id.* at 77-79.

We agree DHS established that: Mother exhibited "repeated and continued incapacity, abuse, neglect or refusal;" this caused the Children "to be without essential parental care, control or subsistence necessary for [her] is physical or mental well-being;" and Mother cannot or will not remedy the "causes of the incapacity, abuse, neglect or refusal." *See In re Adoption of C.D.R.*, 111 A.3d at 1216; *In re Adoption of M.E.P.*, 825 A.2d at 1272. We thus do not disturb the Orphans' Court's ruling under Section 2511(a)(2). *See* 23 Pa.C.S. § 2511(a)(2). We need not address any other subsections of Section 2511(a). *See In re B.L.W.*, 843 A.2d at 384.

Counsel presents Mother's second issue — that Mother had a strong emotional and parental bond with the Children, and that the Children would suffer negative effects if the bond was permanently severed. *See Anders* Brief at 11. Counsel points out Mother was fairly consistent in her weekly supervised visits. *Id.*

This Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of

the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. . . .

*In re T.S.M.*, 71 A.3d at 267 (citations omitted). "[T]he court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d at 1121. The court is not required to consider expert testimony, and social workers and caseworkers may offer evaluations. *Id.* "[W]here there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists". *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

> "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent . . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (citations omitted).

In addressing Section 2511(b), the trial court referred to its analysis of the Section 2511(a)(5) factors:

> [I]t does not appear, given the length of time for the whole history of this case that [Mother] is going to be able to address her drug and alcohol issues or her mental health issues. The visitation coach and the outcome specialist both testified that over the last month, [Mother]'s mental health has clearly decompensated to the point where she's yelling in the visits, or

- 19 -

barking like a dog, or attempting to leave the visitation room with the children without asking CUA to go with her.

And I don't have any reason to believe that [Mother] can remedy that in the next two months given that she's already been given three years to address the exact same objectives. And I do believe that it is in these children's best interest to have some permanency and not stay in the system indefinitely. They are in a foster home with a sibling.

They are doing well in that home. And the testimony from the visitation coach is that, in fact, they are very bonded. Or I will[,] from [the] visitation coach's testimony, conclude that they are very bonded to their foster parents such that when they start the visits, they're crying. And when they end the visits, they are able to transition back to their foster parents without any issue. And so, I am going to find that it's best for them to stay where they are.

N.T. at 80-81. With regard to the potential negative impact on the Children,

the court further observed:

Based on the testimony of the CUA case manager and . . . the visitation coach . . . I am going to find that there would not be any detrimental impact to these children if [Mother's parental rights are terminated.]

[The Children] are in a foster home[.[5] T]he testimony indicated they are very bonded to the foster parents with whom they've resided for a year. That is the only . . . parents they really know.

[Mother], while she has maintained most of her visits and the testimony from CUA, is that she has come and she is appropriate. Up until the end of September through now, she has been appropriate with her visits. Being appropriate in visits is not sufficient in terms of maintaining a place of importance in your child's life.

---

[5] The trial court noted that at this point in the proceedings, Mother left the courtroom, "slamming [the door] against the wall. N.T. at 82.

And so, I'm going to find that there wouldn't be any detrimental impact at this point in time for terminating involuntarily [Mother's] parental rights pursuant to [Section] 2511(b).

*Id.* at 81-82.

Upon review, we again discern no abuse of discretion. We reiterate the testimony of Ms. Stackhouse that the Children cry when the visits begin and are easily able to separate from Mother when the visits end. Mother is not currently able to engage in age-appropriate play with, or care for, the Children during these visits. Further, Mother's own testimony did not mention any bond with the Children, or even her own feelings of love and affection for the Children. Accordingly, it is reasonable to infer that no parental bond exists. *See In re K.Z.S.*, 946 A.2d at 763. The record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

In sum, we agree with Counsel that Mother's issues are frivolous. We have independently reviewed the record and find no other issues of arguable merit that Mother could pursue on appeal. For the foregoing reasons, we conclude the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed. Counsel's petition to withdraw granted.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 5/1/2020*